[No. C060358. Third Dist. June 22, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON ALEXANDER MORRIS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

**COUNSEL**

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Joseph M. Cook, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ROBIE, J.—Convicted of robbery, grand theft (theft from the person of another), and petty theft with a prior, defendant Jason Alexander Morris appeals contending there was insufficient evidence to support a sentence enhancement finding that he knew or should have known his victim was developmentally disabled, and the trial court prejudicially erred in failing to instruct on theft as a lesser included offense of robbery. Defendant also contends the trial court prejudicially erred in instructing the jury on the sentence enhancement, and expert opinion testimony was necessary with respect to the enhancement.

In the published portion of our opinion, we agree there was insufficient evidence that defendant knew or should have known the victim, who suffers from schizophrenia, was "developmentally disabled" within the meaning of the enhancement statute (Pen. Code,[1] § 667.9, subd. (a)). Accordingly, we will strike that enhancement. In the unpublished portion of the opinion, we also agree the trial court erred in failing to instruct on theft *as a lesser included offense* of robbery, but find that error harmless as to defendant's robbery conviction. We will, however, vacate defendant's theft convictions, as defendant could not be convicted of robbery *and* the lesser included theft offenses. In light of these modifications—particularly the striking of the section 667.9 enhancement—we will remand the case to the trial court for resentencing.

FACTUAL BACKGROUND

In May 2008, S.B. was shopping at the S & K Market, as she did every week. Defendant, who shopped at the store regularly, had seen S.B. before and felt she was a nice person from having "seen her around." Defendant saw S.B. go into the store and saw her come out about five to 10 minutes later. He saw her put her purse down and asked her if she was " 'okay,' because she sort of was looking around." S.B. had put her purse on the ground to load her purchases into her purse, but the purse was touching her foot. Defendant walked up to her and grabbed her purse off the ground. S.B. struggled with defendant over the purse, but she lost her hold and fell down, and defendant fled with the purse. S.B. pursued defendant, yelling at him to

---

[1] All further section references are to the Penal Code unless otherwise noted.

give her purse back. As she followed him, he punched her and knocked her down. She got up and continued chasing him.

Debra Williams, a witness in a passing vehicle, saw defendant snatch the purse from S.B.'s feet, saw S.B. catch defendant and grab the purse, and saw defendant punch S.B. and knock her to the ground. Michael Faulkner, Jesse Ramirez, and Tim Ashlock chased after defendant. Faulkner caught defendant and told him to stop. Defendant eventually slowed down and gave Faulkner the purse. Faulkner told the others to call the police. When defendant resisted, Faulkner and Ashlock wrestled him to the ground and ultimately tied his hands to restrain him.

When Stockton Police Officer David Reeder arrived on the scene, he saw two men holding defendant down. Officer Reeder took defendant back to his patrol car. On the way there, defendant said he was not "going to go back to this bullshit." Officer Reeder placed defendant under arrest, gave him *Miranda*[2] warnings, and interviewed him. Defendant admitted he took the purse off the ground and claimed it was not a big deal. He said she said, " 'give it back.' He said he didn't have to listen to a crazy lady." Defendant referred to S.B. as a "crazy lady" a couple of times.

Defendant testified he saw S.B. go in the store and come out about five to 10 minutes later carrying her purse. She set it on the ground and began to roll a cigarette. He approached her and asked if she was okay, and she responded she was fine. Then he grabbed her purse and ran away.

A number of people chased defendant. He stopped running because he thought the police were chasing him. He returned the purse and apologized for taking it. Then the men chasing him beat him up and detained him until police arrived. Defendant denied punching S.B. or struggling with her for the purse. He denied he knew she had mental health issues, but admitted she looked like an easy target.

S.B. had been taking medication for schizophrenia since she was 18 years old. She lived in a board and care home; she could not live on her own. The home provided her food, did her laundry, administered her medications, cooked her food, and helped with her day-to-day living activities. There was a 9:00 p.m. curfew. If she was doing well, she could come and go as she liked, but if she was not doing well, the home could ask her to stay there. The home also helped with housecleaning and monitored any unusual behavior of its residents.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

S.B. stayed in school until she was about 18 years old and received her GED (general equivalency diploma). She also may have taken some community college classes. S.B. walked by herself to places such as the market, the park, and the community center. She did not take the bus because she was afraid the bus would crash based on how it leans. She supported herself financially by selling clothes.

Every two weeks S.B. got an injection of Haldol to control her auditory hallucinations. When she did not get the medication, she talked to herself and could not find her way home. She was on her medication when defendant stole her purse.

S.B. had received assistance from San Joaquin County Behavioral Health Services since 1998. Vicki Simpson had been her behavioral health caseworker since 2006. In 2006, before S.B. moved into the residential care home, Simpson visited her apartment. The apartment was "seriously dilapidated." S.B. was not attending her health care appointments, and her apartment was filthy and cockroach infested. There were dirty dishes in the sink that had not been washed for weeks. There was hardly any food in the apartment. She was afraid to get dentures because she thought her teeth would grow back from taking vitamins. The residential home where she lived brought S.B. to her psychiatric and health care appointments, helped her function in the community, and administered and monitored her medications.

## PROCEDURAL HISTORY

Defendant was charged by information with robbery, grand theft (theft from the person of another), and petty theft with a prior. The information further alleged that defendant had two prior convictions (including one for grand theft) for which he had served prison terms. The information also alleged an enhancement under section 667.9 for each of the three counts. Section 667.9 provides for a one-year sentence enhancement when the defendant knows or reasonably should know that the victim of an enumerated offense is 65 years of age or older, blind, deaf, developmentally disabled, a paraplegic, a quadriplegic, or under 14 years old. Here, the information did not specify which condition applied, but the case was tried on the theory that the victim, S.B., was developmentally disabled.[3]

The trial on the prior prison term allegations was bifurcated and the substantive charges and the section 667.9 enhancement were presented to a

---

[3] Although the information alleged a section 667.9 enhancement for each count, ultimately the jury was asked to decide that enhancement as to the robbery charge only, presumably because while robbery is one of the enumerated offenses to which the enhancement applies, theft is not. (See § 667.9, subd. (c)(3).)

jury. The trial court instructed the jury on robbery, grand theft, and petty theft as distinct charges. The court did not instruct the jury that theft is a lesser included offense of robbery, nor that they could convict defendant on only one of the three charges.

On the section 667.9 enhancement, the court instructed the jury as follows:

"[T]o prove this allegation, the People must prove at the time of the theft [S.B.] was developmentally disabled and at the time of the theft, defendant knew or reasonably should have known that [S.B.] was developmentally disabled.

"Developmentally disabled means a severe, chronic disability of a person that:

"One, is attributable to mental or physical impairment or a combination of mental or physical impairment.

"Two, is likely to continue indefinitely.

"And, three, results in a substantial functional limitation in three or more of the following:

"A, to care for one's self.

"B, to understand and express language.

"C, to learn.

"D, to be independently mobile.

"E, to engage in self-direction.

"F, to live independently or G, to be economically self-efficient [sic]."

The jury found defendant guilty of all three counts and found the section 667.9 enhancement allegation true. The court found the prior prison term enhancement allegations true.

The trial court denied probation and sentenced defendant to an aggregate term of six years in prison, consisting of the middle term of three years for robbery, a consecutive one-year term for the section 667.9 enhancement, and one year for each of the prior prison term enhancements. The trial court stayed sentence on the "lesser include[d] [theft] offenses" under section 654.

## DISCUSSION

### I

### *The Section 667.9 Enhancement*

Section 667.9 provides in pertinent part as follows: "Any person who commits [an enumerated offense] against a person who is 65 years of age or older, or against a person who is blind, deaf, developmentally disabled, a paraplegic, or a quadriplegic, or against a person who is under the age of 14 years, and that disability or condition is known or reasonably should be known to the person committing the crime, shall receive a one-year enhancement for each violation."

Subdivision (d) of section 667.9 provides that "[a]s used in this section, 'developmentally disabled' means a severe, chronic disability of a person, which is all of the following:

"(1) Attributable to a mental or physical impairment or a combination of mental and physical impairments.

"(2) Likely to continue indefinitely.

"(3) Results in substantial functional limitation in three or more of the following areas of life activity:

"(A) Self-care.

"(B) Receptive and expressive language.

"(C) Learning.

"(D) Mobility.

"(E) Self-direction.

"(F) Capacity for independent living.

"(G) Economic self-sufficiency."

Defendant contends the trial court prejudicially erred in instructing the jury on the section 667.9 enhancement because the "areas of life activity" referenced in the statute "have a complex and peculiar meaning which needed further clarification and definition." He also contends expert testimony was

necessary to assist the jury in determining whether S.B. had a substantial functional limitation in three or more of these areas of life activity. Finally, he contends "there was insufficient evidence to support the [section 667.9] enhancement because the prosecution failed to prove [S.B.] was developmentally disabled within the meaning of [the statute]" and, "[m]ore significantly, . . . failed to prove by substantial evidence that [defendant] knew or reasonably should have known that [S.B.] suffered from such an indefinite mental or physical impairment resulting in a substantial functional limitation in three or more of the abilities listed in subdivision (d)(3)."

We will assume for the sake of argument that no special instruction further defining the areas of life activity described in the enhancement statute and no expert testimony regarding those areas of life activity was required. We will also assume there was sufficient evidence that S.B. was developmentally disabled within the meaning of the statute. Even with these assumptions, however, we conclude the enhancement must be stricken because there was no substantial evidence that the fact S.B. was developmentally disabled was "known or reasonably should be known to" defendant at the time of the incident.

The People contend "[t]here was sufficient evidence for the jury to find that [defendant] knew that [S.B.] was developmentally disabled" because he "testified that he knew of [S.B.], had observed her for some time on the day of the robbery, and had talked to her previously." He also "testified that he generally thought of [S.B.] as a 'very nice person' " and "at the time of his arrest . . . repeatedly referred to [S.B.] as a 'crazy lady.' "

 None of these facts, alone or together, was sufficient to support a determination beyond a reasonable doubt that defendant knew S.B. was "developmentally disabled" within the meaning of section 667.9. True, the jury could reasonably have inferred from the evidence that defendant knew S.B. had some sort of mental impairment—thus, his reference to her as a "crazy lady." But that alone was not enough to satisfy the knowledge element of the statute. To prove that defendant knew S.B. was developmentally disabled, there had to be evidence from which the jury reasonably could have found that defendant knew S.B. was mentally impaired *and* knew that, as a result, she had a severe, chronic disability that was likely to continue indefinitely and that resulted in her being substantially functionally limited in three or more of the specific areas of life activity identified in the statute (self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, and economic self-sufficiency). Without this knowledge, defendant could not have known S.B. was "developmentally disabled" as the enhancement statute defines that term.

The People's argument on defendant's constructive knowledge of S.B.'s developmental disability fares no better. Essentially, they assert that because "[S.B.] appeared before the jury" and "[t]he jury had the opportunity to view and listen to her," "the jury was in the best position to determine whether [defendant] . . . should have reasonably known about [S.B.]'s impairment." In support of this argument, the People reference the prosecutor's closing argument, in which he suggested defendant reasonably should have known S.B. was developmentally disabled "by [his] interaction with her." To support this argument, the prosecutor asked the jury, "How long did it take you to find out just from listening to her testify that she, you know, mentally wasn't all there completely? It's not really—it's something that's just notable. And if you communicate with somebody on more than one occasion like him who claims to be in tune with that type of thing, then you reasonably should have known that especially when you're using derogatory language to refer to that person afterwards."

We reject this constructive knowledge argument for the same reason we rejected the People's actual knowledge argument. Just because defendant had reason to know S.B. had a mental impairment—in the prosecutor's words, was not "all there"—did not mean he had reason to know that, as a result of her impairment, she had a severe, chronic disability that was likely to continue indefinitely and that resulted in her being substantially functionally limited in three or more of the specific areas of life activity identified in the statute (self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, and economic self-sufficiency).

■ The concepts of "mental impairment" and "developmental disability" are not coextensive, particularly under section 667.9. Thus, the mere fact that S.B. suffered from an apparent mental impairment (in her case, schizophrenia) did not mean she was developmentally disabled, and the mere fact that defendant may have had reason to know she suffered from a mental impairment did not mean defendant had reason to know that the other facts necessary to classify S.B. as developmentally disabled within the meaning of the enhancement statute existed.

The People's reliance on *People v. Smith* (1993) 13 Cal.App.4th 1182 [16 Cal.Rptr.2d 820] to support their argument is misplaced. In *Smith*, the defendant argued that the evidence was insufficient to support the jury's finding under section 667.9 that he should have known his victim was 65 years of age or older because "although the jury could view the victim's physical appearance at trial, the prosecutor noted for the record only that [her] hair was gray, but did not note any other physical characteristics indicating her to be more than a certain age." (*Smith*, at p. 1190.) The Court of Appeal rejected this argument, stating, "the record shows that the evidence

presented to the jury included [the victim]'s physical appearance before the jury. Evidence was also presented that [she] was just three months short of her sixty-eighth birthday on the day of the robbery. We therefore presume, in support of the judgment, that the jury could reasonably deduce from its view of [her] physical appearance that defendant reasonably should have known that she was at least 65 years old." (*Ibid.*)

The fact that a jury may reasonably deduce a person's *age* from that person's physical appearance in no way supports the conclusion that a jury may reasonably deduce from a person's appearance that the person is *developmentally disabled within the meaning of section 667.9.* Obviously, as we have explained above, proof of developmental disability requires far more than looking at and/or listening to someone and deciding the person is "crazy" or "not all there." Indeed, to prove here that S.B. was developmentally disabled, the prosecution did far more than bring her into the courtroom for the jury to see and hear. As we have detailed above, the prosecution elicited extensive testimony about S.B.'s schizophrenia and how it affected her ability to live, work, and care for herself (among other things). There was no evidence, however, that defendant was aware of any of these things when he took S.B.'s purse. On this record, all he knew or had reason to know was that she had some sort of mental impairment. Because that was not sufficient to support imposition of the section 667.9 enhancement, we will strike that enhancement.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The section 667.9 enhancement is stricken, and the convictions for grand theft and petty theft with a prior are vacated. The case is remanded to the trial court for resentencing on the robbery conviction.

Hull, J., concurred.

**SCOTLAND, P. J.,** Concurring.—With one exception, my colleagues got it right. We differ only on whether there is sufficient evidence to support the jury's finding that defendant knew or reasonably should have known that the victim of his crime was "developmentally disabled" within the meaning of Penal Code section 667.9, subdivisions (a) and (d).

---

*See footnote, *ante,* page 1147.

My colleagues begin by assuming the evidence establishes that the victim was "developmentally disabled" within the meaning of the statute. It does.

The evidence showed that the victim suffered from schizophrenia and was unable to live independently. Thus, she stayed in a board and care home to obtain needed help with the tasks of day-to-day living. When the victim had lived alone, her apartment was filthy. Indeed, a mental health specialist described the apartment as "gross." For example, cockroaches were on the floor, unwashed dishes appeared to have "been there for a number of weeks," and hardly any food was in the apartment. The victim suffered from anxiety even when taking medication for her mental illness. The medication would stop her from hearing voices, allow her to remember things that she would otherwise forget, and help her to have a normal life. However, if the victim did not take her medicine, she would walk the streets talking to herself and could not find her way home. The victim would not wear dentures because she believed that her teeth would grow back since she was taking vitamins.

Based on this evidence, a jury reasonably could find that the victim's mental illness was likely to continue indefinitely and caused her to have substantial functional limitations in three areas of life activity: self-care; capacity for independent living; and self-direction. (Pen. Code, § 667.9, subd. (d)(1), (2), (3)(A), (E) & (F).)

In my view, the evidence is also sufficient to support the jury's finding that defendant knew or reasonably should have known that the victim of his crime was developmentally disabled. (*People v. Prince* (2007) 40 Cal.4th 1179, 1251 [57 Cal.Rptr.3d 543, 156 P.3d 1015] [in assessing the sufficiency of the evidence, we presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence].)

For starters, by his own admission, defendant knew the victim was mentally ill; he called her the "crazy lady." Defendant also admitted he had seen, spoken to, and "interacted" with the victim on other occasions prior to stealing her purse. Because defendant described the victim as the crazy lady, the jury reasonably could deduce that his prior interaction with the victim occurred at times when she was not taking her medication. When the victim failed to take her medication, she would walk the streets talking to herself and was unable to find her way home. Even when she took medication, her mental illness was apparent. During summation, the prosecutor observed that the victim's mental problem was "something that's just notable" and that, having listened to her testify, jurors must have recognized the victim "wasn't all there completely." Even defense counsel acknowledged the victim was "somebody who appears different." Thus, the jury could reasonably deduce that, when he grabbed the victim's purse, defendant knew the victim's mental

illness impaired her ability to function. Indeed, defendant admitted that, before he grabbed the victim's purse, he asked her if she was "okay" because "she sort of was looking around." He also admitted that the victim "look[ed] like [she was] an easy target" at first. These admissions—coupled with evidence that the victim was an older, toothless person who would not wear dentures because she believed her teeth would grow back since she was taking vitamins, who suffered from anxiety even when taking her medication, and who was confused and talking to herself when not taking her medication—paint the picture that, from his interactions with her on other occasions and from his observations of her on the day that he grabbed her purse, defendant was aware or reasonably should have been aware that the victim's mental illness substantially limited her ability to function in life activities such as self-care, the capacity for independent living, and self-direction.

The majority's contrary conclusion fails to allow for reasonable inferences that a layperson is capable of deducing. To instead apply the majority's test will effectively mean that, unless the evidence establishes that a defendant is a mental health expert, a jury never could find a defendant knew or had reason to know that a victim was developmentally disabled.